IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE DEL BAGGIO and MARSHA DEL BAGGIO, husband and wife, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 3:05-378 |
| v. | ) ) | JUDGE KIM R. GIBSON |
| MAYTAG CORPORATION, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

**Gibson, J.,**

This matter comes before the Court on motion of Defendant, Maytag Corporation, (hereinafter "Maytag" or "Defendant"), requesting summary judgment and seeking to foreclose all claims brought by Plaintiffs, George and Marsha Del Baggio (hereinafter jointly as the "Del Baggios" or "Plaintiffs" and individually as "Mr. Del Baggio" or "Mrs. Del Baggio") alleged in the complaint filed in this action.

This lawsuit arises out of a fire at the Del Baggio residence in Tyrone, Pennsylvania on July 2, 2004. Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 44) (hereinafter "DSOF") ¶2. Plaintiffs allege that the fire was caused by a defect or malfunction of a Maytag Gemini electric range, Model Number MER6770AAW, which was installed and used in their residence. DSOF ¶3; Plaintiff's Response to Movant's Concise Statement of Undisputed Material

Fact (Doc. No. 51) (hereinafter "PSOF") ¶3.

The Maytag Gemini electric range at the center of this litigation was manufactured in February, 2000, in Cleveland, Tennessee. DSOF ¶9. The original purchaser of the range was one Debra Noon, who bought the range from Lowe's and had it installed in her home on December 5, 2000. DSOF ¶12. Debra Noon testified that in the nearly two years in which she owned the range, she used it approximately four times per week and had no problems with it. DSOF ¶14.

The Del Baggios purchased the range from Debra Noon in October 2002. DSOF ¶13. Mrs. Del Baggio testified that during the time the Del Baggios owned the range it was used approximately five times per week without any problems, other than when the fire occurred. DSOF ¶15; PSOF ¶15. Mr. Del Baggio likewise testified that they did not experience any problems with the range other than the fire. DSOF ¶17; PSOF ¶17.

On July 2, 2004, at approximately 6:15 p.m., Mr. Del Baggio preheated the oven to 350 degrees to make a pizza. DSOF ¶18. The pizza was cooked for approximately twenty-five minutes, finishing sometime before 7:00 p.m. DSOF ¶19. After cooking the pizza, Mr. Del Baggio testified that he turned the stove off, watched a game show on a television in the kitchen, and then left the residence at approximately 7:35 p.m. DSOF ¶20. Mr. Del Baggio stated that he did not notice anything unusual about the range at any time that day. DSOF ¶21.

Mrs. Del Baggio was on a lower level of the residence when Mr. Del Baggio was cooking the pizza in the kitchen. DSOF ¶22. Although Mrs. Del Baggio did not see Mr. Del Baggio turn the oven off, he told her that he had shut everything off before leaving that evening. DSOF ¶23. While downstairs playing a card game on the computer, Mrs. Del Baggio heard a noise between 7:35 and 7:45 p.m. DSOF ¶24. Mrs. Del Baggio went upstairs and saw flames shooting out of the top of the

stove from the back, and, after unsuccessfully attempting to quell the fire with water, she threw flour on it. DSOF ¶25; PSOF ¶25. Mrs. Del Baggio then ran outside and called 911. DSOF ¶26.

Paul Morrison (hereinafter "Morrison"), Fire Marshal for Snyder Township, responded to the fire at the Del Baggio residence on July 2, 2004. DSOF ¶27. Morrison entered the Del Baggio residence during fire fighting operations and observed flames in the kitchen and dining room. DSOF ¶29. At that time, Morrison believed the area of origin of the fire was in the kitchen or dining room. DSOF ¶30. Morrison returned to the fire scene the following day and concluded that the origin of the fire was at the range based upon fire patterns observed in the kitchen, and that, based upon his experience and the fire scene as a whole, the fire occurred in the back of the range where the controls were. DSOF ¶31; PSOF ¶31. Morrison does not know whether anything was on the range's cooktop or inside the oven at the time of the fire. DSOF ¶32. Morrison likewise does not know what combustibles are contained in the control panel of the stove, and was unable to determine the ignition source of the fire. DSOF ¶33.

The Del Baggios have produced reports of William Jakela (hereinafter "Mr. Jakela"), a cause and origin expert, and Richard Wunderley (hereinafter "Mr. Wunderley"), an electrical engineer, to support their claims. DSOF ¶34. In his report, Mr. Jakela identifies the wiring harness within the control panel enclosure of the range as the origin of the fire. DSOF ¶35. Mr. Wunderley's opinion is that the membrane switch in the control panel of the range experienced electrical failure, which ignited the plastic membrane and surrounding combustibles and ultimately resulted in the fire damage to the structure, according to his report. DSOF ¶36.

Mr. Jakela holds himself out as an expert in fire origin and cause, but is not an engineer. DSOF ¶39. Mr. Jakela conducted no testing prior to determining the cause of the fire prior to

3

finishing his report. DSOF ¶40. Mr. Jakela testified that to determine the cause of a fire an ignition source and a first fuel must be identified. DSOF ¶41; PSOF ¶41. Although Mr. Jakela could not specifically identify the first fuel for the fire in the Del Baggio residence, he believed that the first fuel ignited in the control panel was the wire insulation and plastic vinyl components internal to the control panel. DSOF ¶42; PSOF ¶42.

Mr. Jakela does not know how a membrane switch for a stove works, and was unable to determine where the fire began within the control panel. DSOF ¶43. Mr. Jakela stated that he was speculating about whether there could have been enough heat and energy in the control panel enclosure to produce a fire, but that he did not need to know how much heat was generated to know that a fire started in a particular place. DSOF ¶44; PSOF ¶44. Mr. Jakela observed that the metal enclosure around the control panel did not melt in the fire. DSOF ¶45. Mr. Jakela was unable to identify the sequence of fuels and the fire's propagation that allowed the fire to escape the metal enclosure around the control panel and ignite nearby combustibles. DSOF ¶46. Neither does Mr. Jakela know the flammability characteristics of the components inside the control panel, but he testified that he would not need to know the flammability characteristics of the fuel package because the physical evidence he observed in this matter indicated that the fire originated at a certain point. DSOF ¶47; PSOF ¶47. Mr. Jakela testified that without knowing whether the materials of construction of the control panel would support combustion his opinion is just speculation, but that based upon his experience and his observations at the fire scene he was able to determine that the fire occurred within the control panel of the range. DSOF ¶48; PSOF ¶48.

Mr. Jakela initially included the cooktop of the range as part of the area of origin of the fire, but it was subsequently ruled out as the cause of the fire. DSOF ¶49; PSOF ¶49. Mr. Jakela could

not determine whether any of the range elements were energized at the time of the fire. DSOF ¶50. During the investigation, Mrs. Del Baggio informed Mr. Jakela that a pot, a pan, and a tea kettle were on the cooktop at the time of the fire, and Mr. Jakela photographed them at the fire scene. DSOF ¶51. Although Mr. Jakela looked at the pot and pan, he was unable to identify the material they were made of and could not identify the charred mass inside the pot depicted in his photograph of the pot and pan; however he testified that the evidence at the scene did not support a fire originating on the cooktop and that he believed the charred mass in the pan was fall down from the cabinet. DSOF ¶52; PSOF ¶52.

Mr. Jakela observed a circular burn pattern on the front left burner of the cooktop and, although he did not know what made it, believed that it was caused by external fire damage. DSOF ¶53; PSOF ¶53. Mr. Jakela observed melting of portions of the pan, including the handle. DSOF ¶55. Mr. Jakela did not preserve the pot and pan. DSOF ¶56. Mr. Jakela admitted that a cooktop fire could have ignited the wallpaper behind the stove and caused the damage to the kitchen, but it was his opinion that is not what occurred in this matter. DSOF ¶58; PSOF ¶58.

Mr. Jakela did not conduct any tests to determine what kind of damage could be caused to a control panel subjected to an external heat source. DSOF ¶60. Mr. Jakela testified that he is speculating that there could have been a fire inside the control panel compartment which created a high level of damage inside the compartment, escaped the compartment and ignited combustibles in the room, but did not damage the front face of the control panel, but that a cooktop fire was eliminated by examining the burn patterns, the control panel, and observing the lack of burning on the face of the control panel, among other things. DSOF ¶61; PSOF ¶61.

Mr. Wunderley is an electrical engineering expert but does not hold himself out as an expert

in fire origin and cause determination. DSOF ¶63; PSOF ¶63. Mr. Wunderley testified that within a reasonable degree of scientific certainty there was a failure or malfunction within the control panel of the range which ignited combustibles within the control panel that then resulted in the damage to the Del Baggio residence. PSOF ¶64. Mr. Wunderley tested his hypothesis that the stove malfunctioned and caused the fire by examining the fire scene, the range, tracing the wiring and things on the back of the range to verify potential electrical failures. PSOF ¶65.

Mr. Wunderley stated that Mr. Jakela determined the area of origin of the fire as in and around the range. DSOF ¶66.

Mr. Wunderley testified that he did not know the current which flows through the membrane switch and whether that current is capable of producing enough heat to start a fire, but that the electrical current that flowed through the short circuit in the control panel produced heat which ultimately caused the fire and in his opinion it was not necessary for his conclusion to know what voltage and current was flowing there because the evidence substantiated that the fire had started in that area and there were combustibles within the unit and outside the unit that would have burned. DSOF ¶67; PSOF ¶67.

Mr. Wunderley testified that the membrane switch consists of two thin layers of copper separated by a non-conducting material which has holes in it so that pressing the copper at a point where there is a hole in the separating material makes contact between the copper layers creating an electrical connection which operates the different functions of the range. DSOF ¶68. Under normal operation, depressing the area for a certain function makes a connection between the layers of the switch through the membrane, creating a short circuit at that point sending an electrical impulse through the trace wiring to the circuit board to operate that function. DSOF ¶69.

Mr. Wunderley believes that the membrane was the first fuel, and that combustibles within the unit ignited and burned. DSOF ¶70; PSOF ¶70. Mr. Wunderley acknowledged that after identifying a heat source capable of igniting something, it was not his role in this matter to get involved with the material science aspect of the fire. DSOF ¶71. Mr. Wunderley was unable to ascertain to a reasonable degree of engineering certainty that the control panel contained materials that were sufficiently flammable and would support combustion producing a fire in the membrane switch that could lead to a fire inside the metal enclosure and escape the metal enclosure and ignite external combustible material. DSOF ¶72.

Mr. Wunderley testified that he investigated only electrical causes of the fire, and that other possible causes of the fire would have to be ruled out by other experts, although he was able to rule out the pot and pan as the cause of the fire based upon his observations of the damage to the control panel itself, information provided by Mr. Jakela, and information provided by Mrs. Del Baggio. DSOF ¶73; PSOF ¶73. Mr. Wunderley stated that he did not know where the pot and pan were at the time of the fire and was unable to identify the charred debris found inside the pot and pan in Mr. Jakela's photographs. DSOF ¶74.

Mr. Wunderley stated in his expert report and in his testimony that a failure or malfunction of the range caused the fire and that he believes a short circuit caused the fire, but he acknowledges the possibility that a membrane switch could create a short circuit as a result of external heat attack. DSOF ¶75; PSOF ¶75.

The Del Baggios and their insurance carrier, Erie Insurance Company, commenced this action against Maytag in the Court of Common Pleas of Blair County, Pennsylvania, by way of complaint filed on or about September 13, 2005. DSOF ¶1; PSOF ¶1. Plaintiffs' complaint charges three

7

counts against Maytag alleging strict liability, negligence, and breach of express and implied warranties arising out of the fire occurring in the Del Baggio residence on July 2, 2004. DSOF ¶2. Maytag filed a Notice of Removal on or about September 23, 2005, bringing the matter before this Court. DSOF ¶4. On October 10, 2005, Maytag filed an answer to Plaintiffs' complaint and affirmative defenses denying the material averments alleged by Plaintiffs. DSOF ¶5. On October 31, 2007, Maytag filed a motion for summary judgment together with the appropriate supporting documentation, and Plaintiffs have replied. That motion is the subject of this memorandum.

The standard governing the entry of summary judgment is set forth in Federal Rule of Civil Procedure 56(c), which reads in pertinent part: "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

This Court has summarized the law which guides summary judgment rulings:

> It is the duty of the movant to establish that the record demonstrates an "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).
>
> "The substantive law [identifies] which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). As to the genuineness of an issue of material fact, an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212.
>
> The non-movant can defeat a motion for summary judgment provided that he produces "affirmative evidence" beyond the content of his pleadings that demonstrates the existence of a genuine issue of material fact that remains for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). "Such affirmative evidence - regardless of whether it is direct

> or circumstantial - must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).
>
> In reviewing a motion for summary judgment, the Court is obligated to "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

*Scherer v. Pennsylvania Dept. Of Corrections*, 2007 WL 4111412 at *11, 2007 U.S. Dist. LEXIS 84935 at *39-40 (W.D.Pa., November 16, 2007).

Defendant argues that summary judgment is warranted in its favor in this case because Plaintiffs cannot establish the *prima facie* elements under their theories of negligence, strict liability, and breach of warranty. Specifically, Defendant asserts that Plaintiffs' experts are unable to establish that the range was defective or that a defect in the range caused the fire. Plaintiffs argue that it is unnecessary to establish a specific defect in the range and that this case is proceeding on a malfunction theory of products liability. Defendant rejoins by arguing that because one of Plaintiffs' experts identified a specific component of the range that caused the fire the malfunction theory is not available to Plaintiffs. Defendant further argues that, even were Plaintiffs to proceed on a malfunction theory, summary judgment is still appropriate due to the prolonged use of the range prior to the fire, that Plaintiffs cannot rule out secondary causes of the fire, and that Plaintiffs cannot establish that the defect caused the fire. Plaintiffs retort that the malfunction theory has been argued since the commencement of this action and that, despite Plaintiffs' expert identifying a specific component of the range that malfunctioned, the component identified has multiple electrical components within it, and therefore Plaintiffs merely limited the malfunction to a specific area of the range and did not transmute their theory of recovery from malfunction to specific defect.

9

The Court first addresses whether this case is to proceed under the specific defect theory or malfunction theory of products liability. The Pennsylvania Superior Court[1] explained ways in which a plaintiff may recover in a products liability case:

> In some cases, the plaintiff may be able to prove that the product suffered from a specific defect by producing expert testimony to explain to the jury precisely how the product was defective and how the defect must have arisen from the manufacturer or seller. In cases of a manufacturing defect, such expert testimony is certainly desirable from the plaintiff's perspective, but it is not essential. The plaintiff, even without expert testimony articulating the specific defect, may be able to convince a jury that the product was defective when it left the seller's hands by producing circumstantial evidence. Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect. *See* Litvin & McHugh, PENNSYLVANIA TORTS: LAW AND ADVOCACY (1996) § 9.33. However the plaintiff chooses to present his or her case, the goal is the same: to prove that the product was not only defective, but that such a defect existed when it left the hands of the seller.

*Dansak v. Cameron Coca-Cola Bottling Company*, 703 A.2d 489, 496 (Pa.Super. 1997), *petition for allowance of appeal denied*, 556 Pa. 676, 727 A.2d 131 (1998). Proceeding under the latter approach has come to be known as the "malfunction theory." *See, e.g., Barnish v. KWI Bldg. Co.*, 916 A.2d 642, 646 (Pa.Super. 2007).

Defendant's position seems to be that because Plaintiffs' expert identified a specific component of the range as the origin of the fire, Plaintiffs are constrained to proceed under the

---

[1] As this federal court is asserting diversity jurisdiction, the case must be adjudicated in accordance with applicable state law. *Erie Railroad v. Tompkins*, 304 U.S. 64, 78 (1938). The parties do not dispute that Pennsylvania law controls the substance of this action. Federal law governs this case procedurally. *Hanna v. Plumer*, 380 U.S. 460, 473-74 (1965).

10

specific defect theory. The malfunction theory affords a plaintiff an alternative route to establishing the existence of a defect but does not ban the plaintiff from producing direct evidence that by itself would be insufficient under the specific defect theory. The *Dansak* court described direct evidence of a specific defect as "desirable . . . but . . . not essential" to the malfunction theory. 703 A.2d at 496. The Court does not find any support for the proposition that direct evidence is forbidden in a malfunction theory case. Rather, the lack thereof does not defeat a plaintiff's claim entirely.

Moreover, it appears from the record that Plaintiffs intended to proceed on a malfunction theory and have done so. Defendant claims that one of Plaintiffs' experts pointed to a specific component in the range. Plaintiffs insists that the component in turn contains several electrical components and that the expert was not pointing out a specific defect. Viewed in the light most favorable to Plaintiffs, the expert's comment does not persuade the Court that Plaintiffs have abandoned the malfunction theory.

Defendant's attacks on Plaintiffs' ability to maintain a cause of action under the malfunction theory are that the range was used for a prolonged period of time prior to the fire, that Plaintiffs cannot rule out secondary causes of the fire, and that Plaintiffs cannot establish that the defect caused the fire.

The range was used for approximately three and a half years preceding the fire. The original owner Debra Noon stated that she used the range approximately four times per week and experienced no problems with the range in the almost two years that she owned it. The Del Baggios stated that they used the range approximately five times per week and experienced no problems with the range in the approximately twenty-one months that they used it until the occurrence of the fire. There is no evidence that the range was subjected to abnormal use, and Defendant does not argue that it was

so misused.

The Pennsylvania Supreme Court has explained the prolonged use of a product in the context of the malfunction theory of product liability:

> We recognize that, as a general rule, "prolonged use of a manufactured article is but one factor, albeit an important one, in the determination of the factual issue whether [a defect in design or] manufacture proximately caused the harm." The age of an allegedly defective product must be considered in light of its expected useful life and the stress to which it has been subjected. In most cases, the weighing of these factors should be left to the finder of fact. But in certain situations the prolonged use factor may loom so large as to obscure all others in a case. Professor Prosser has summarized the position generally taken by the courts on this question: "[Lapse of time and long continued use] in itself is not enough, even when it has extended over a good many years, to defeat the recovery where there is satisfactory proof of an original defect; but when there is no definite evidence, and it is only a matter of inference from the fact that something broke or gave way, the continued use usually prevents the inference that the thing was more probably than not defective when it was sold."

*Kuisis v. Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914, 923 (Pa. 1974) (citations omitted).

In this case, the Court concludes that the use of the stove for approximately three and a half years does not "loom so large" as to mandate summary judgment in favor of Defendant. Whether wear and tear, rather than a defect, caused the malfunction normally is a question for the finder of fact. *Kuisis*, 319 A.2d at 923. In *Kuisis*, the court decided not to give the defect question to the jury because the product in question was a crane that had suffered "the vicissitudes of over twenty years of rugged use." *Id.* at 922. Here, the Court finds the task of weighing the age of the range properly goes to the factfinder, especially because Plaintiffs have presented evidence from which a jury could

infer a defect.[2] However old a product is, prolonged use is still just one criterion to consider. *Gower v. Savage Arms, Inc.*, 2002 WL 1833344 (E.D. Pa. 2002) (denying summary judgment in favor of plaintiff because a jury could infer a defect in an eight-year-old rifle). Some courts have expressed a very low tolerance for prolonged use in products liability cases. *See, e.g., Hamilton v. Emerson Elec. Co.*, 133 F.Supp.2d 360, 378 (M.D.Pa. 2001) (finding that the use of a saw for over one year was such prolonged use that it would be speculative for the jury to infer a defect). This Court interprets *Kuisis* as imposing a balancing approach, not a rule where defendants automatically win summary judgment if the product was not brand new when the damage occurred. *See Harley v. Matika USA, Inc.*, 1997 WL 197936, at *4 n.3 ("Lapse of time and continued use may preclude a jury inference of defect, but are not sufficient proof of absence of defect on which to rest summary judgment in favor of defendant." (citations omitted)). The use of the range for three and a half years does not lead inescapably to the conclusion that the range was not defective when it was sold.

Defendant further asserts that summary judgment is warranted in this case because Plaintiffs cannot rule out other secondary causes of the fire besides wear and tear. The Pennsylvania Superior Court expounded on this concept in *Barnish, supra*:

> Plaintiffs/appellants established the occurrence of a malfunction for the purposes of the first prong of a *prima facie* case under the malfunction theory of product liability. However, it is also essential that they eliminate evidence of reasonable secondary causes of the malfunction or abnormal use that appears in their case in chief. Although a plaintiff proceeding under the malfunction theory '[need not] negate every theoretically conceivable secondary cause for the malfunction[,]' the plaintiff cannot establish a *prima facie* case if the plaintiff fails to negate

---

[2]Plaintiffs have appended to their Sur-Reply Brief several websites reporting useful life expectancies for various appliances. The Court has not considered this material. The information is not specific to the Defendant's product. More importantly, the websites do not fall under any of the categories of documents listed in Rule 56(c) and so are not part of the summary judgment record.

13

> evidence of other reasonable, secondary causes that could account for the accident or evidence of abnormal use that the plaintiff introduces in its own case in chief, *i.e.*, based upon its own proof. When it is the *defendant* who hypothesizes or presents evidence of reasonable secondary causes, summary judgment is not warranted.

*Barnish*, 916 A.2d at 646 (citations omitted) (emphasis in original).

Here, there is no evidence of abnormal use of the range, and the only evidence of a secondary cause of the fire is that it was started by the pot or pan or tea kettle left on the stove with a burner allegedly energized. Plaintiffs have ruled out that theory as a cause of the fire. Plaintiffs testified that the cooktop was not used on the date of the fire. Mr. Jakela testified that the evidence did not support a cooktop fire as the origin of the blaze. Mr. Wunderley testified likewise. With this testimony based upon facts observed by Plaintiffs and Plaintiffs' experts, with all inferences drawn in the Plaintiffs' favor, summary judgment would be inappropriate here. Clearly, this Court cannot make credibility determinations in a summary judgment proceeding. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), and therefore will not make any credibility determination regarding this testimony. Furthermore, it is Defendant's theory that the fire originated on the cooktop.

Finally, Defendant contends that Plaintiffs cannot establish that a defect in the range caused the fire. Defendant's argument, without citing any authority whatsoever, is that in order to recover Plaintiffs or their experts must establish with competent evidence:

1. Sufficient energy inside the control panel enclosure to cause ignition;

2. The ignition of combustibles present inside the enclosure;

3. Sustained ignition inside the enclosure and escape of fire outside

14

>   the enclosure; and,
>
> 4. Ignition of combustibles outside the control panel enclosure.

Def.'s Reply Br. (Doc. No. 53), p. 10.

It is true that proceeding under the malfunction theory of product liability does not relieve Plaintiffs from establishing that a defect in the product was a cause in fact for the accident. *See Dansak*, 703 A.2d at 495-96 (citing *Ducko v. Chrysler Motors Corp.*, 639 A.2d 1204, 1205-06 (Pa.Super. 1994)). In this case Plaintiffs have proffered evidence through their experts that the fire at issue in this case was caused by a malfunction of the Maytag range installed in their residence.[3] Whether that evidence is sufficient to establish Defendant's liability in this case is a question of fact to be resolved by the trier of fact. "Where a fire investigator identifies the cause of fire in terms of probabilities (as opposed to mere possibilities) by eliminating all but one reasonable potential cause, such testimony is highly probative." *Breidor*, 722 F.2d at 1138 (citations omitted). "Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury. . . ." *Id.* at 1138-39 (citation omitted).

In order to establish a *prima facie* case under the malfunction theory of product liability, a Plaintiff may raise a supportable inference of defect through (1) evidence of the occurrence of a

---

[3]Defendant incorporates by reference its motion in limine challenging the admissibility of Plaintiffs' experts testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and suggests the Court entertain that motion as a further basis for summary judgment. The Court declines to do so here because, as the Third Circuit has noted, District Courts are to "provide . . . plaintiffs with sufficient process for defending their evidentiary submissions." *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999) (internal quotation omitted). The Third Circuit's approach focuses on protecting plaintiffs from having their expert evidence excluded without an opportunity to be heard. *Id.* at 418. Therefore, the Third Circuit has held that District Courts should conduct *in limine* hearings to provide "the side trying to defend the admission of evidence [with] an adequate chance to do so." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 739 (3d Cir. 1994).

malfunction and (2) evidence eliminating abnormal use and (3) evidence eliminating reasonable, secondary causes for the accident. *Woodin*, 629 A.2d at 975. For the reasons discussed above, the Court finds that Plaintiffs have met this burden.

Therefore, **IT IS HEREBY ORDERED THAT** Defendant's Motion for Summary Judgment (Doc. No. 43) is **DENIED.**

BY THE COURT:

**September 23, 2009**

*/s/ Kim R. Gibson*

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**